**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LINDA CURLEE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>THE UNIVERSITY OF PHOENIX, INC. and ORACLE CORPORATION,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**

Plaintiff Linda Curlee ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, here brings this Class Action Complaint against University of Phoenix, Inc. ("UOPX") and Oracle Corporation ("Oracle," and with UOPX, collectively "Defendants"), and alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action on behalf of herself and all other individuals similarly situated ("Class Members") against UOPX and Oracle for their failure to secure and safeguard the personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members.

2. UOPX is a for-profit private university based in Arizona.[1] In the regular course of its business, UOPX is required to maintain reasonable and adequate security measures to protect

[1] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Dec. 4, 2025).

individuals' PII from unauthorized access and disclosure.

3. Oracle is a multinational firm that provides database software and cloud computing software services to companies across the United States, including Oracle's E-Business Suite ("Oracle EBS").[2] In the regular course of its business, UOPX is required to maintain reasonable and adequate security measures to protect individuals' PII from unauthorized access and disclosure.

4. Upon information and belief, UOPX used Oracle's EBS system to collect, manage, and store its current and former students, employees, faculty members, and suppliers' Private Information.

5. In the course of maintaining this information, UOPX and Oracle possessed extensive amounts of PII, which was not adequately safeguarded and was subsequently exposed to unauthorized third parties in the data breach (the "Data Breach").

6. UOPX and Oracle owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their PII against unauthorized access and disclosure. UOPX and Oracle breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect individuals' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite urgent warnings about how data breaches could severely affect Americans across all economic sectors, companies still fail to make the necessary investments in implementing important and adequate security measures to protect individuals' data.

7. UOPX and Oracle required individuals to provide them with sensitive PII and failed

[2] *About Oracle*, ORACLE, https://www.oracle.com/corporate/ (last visited Dec. 4, 2025); *Oracle E-Business Suite*, ORACLE, https://www.oracle.com/aplication/ebusiness/ (last visited Dec. 4, 2025) (Oracle's EBS is an all-in-one suite of business applications that handles operations, such as financials, supply chain, and human resources procurement).

to protect it. UOPX and Oracle were obligated to secure individuals' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between UOPX and Oracle and Plaintiff and Class Members.

8. As a result of UOPX and Oracle's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

9. Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

10. Plaintiff brings this action on behalf of herself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring UOPX and Oracle to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

11. Plaintiff Linda Curlee is a resident of the State of Washington, whose personal information was compromised in the Data Breach.

12. Defendant UOPX is an Arizona corporation with its principal place of business located at 4035 S Riverpoint Parkway, Phoenix, Arizona 85040. UOPX used Oracle's EBS software to store and maintain current and former students, employees, faculty members, and suppliers' Private Information.

13. Defendant Oracle Corporation is a Delaware corporation with its principal place of business located at 2300 Oracle Way, Austin, Texas 78741.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this controversy under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

15. For purposes of assessing diversity under 28 U.S.C.§ 1332(d), a corporation is considered "a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C.§ 1332(d)(10).

16. This Court has personal jurisdiction over Oracle because Oracle's principal place of business is in this District, it regularly conducts business in Texas, and the acts and omissions giving rise to Plaintiff's claims occurred in and arose from this District.

17. This Court has personal jurisdiction over UOPX because it contracted with Oracle, a Texas-based entity, it does business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and arose from this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Oracle's principal place of business is in this District.

## FACTUAL ALLEGATIONS

19. This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress UOPX and Oracle's willful and reckless violations of her privacy rights. Plaintiff and the other Class Members were individuals who contracted with UOPX and Oracle.

20. On information and belief, Defendant UOPX was impacted in a widespread cyberattack in which an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII.

21. This action pertains to UOPX and Oracle's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach.

22. UOPX and Oracle disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of UOPX and Oracle's failure to safeguard and protect their PII.

23. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, UOPX and Oracle assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

24. Despite recognizing its duty to do so, UOPX and Oracle failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

25. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on UOPX and Oracle to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### *1. The Data Breach*

26. In September 2025, Oracle EBS users received extortion emails from the

cybercriminals claiming a data breach of Oracle EBS.[3]

> Dearest executive,
>
> We are CL0P team. If you haven't heard about us, you can google about us on internet.
>
> We have recently breached your Oracle E-Business Suite application and copied a lot of documents.
> All the private files and other information are now held on our systems.
>
> But, don't worry. You can always save your data for payment. We do not seek political power or care about any business.
> So, your only option to protect your business reputation is to discuss conditions and pay claimed sum.
> In case you refuse, you will lose all abovementioned data: some of it will be sold to the black actors, the rest will be published on our blog and shared on torrent trackers.
>
> We always fulfil all promises and obligations.
>
> We have carefully examined the data we got. And, regrettably for your company, this analysis shows that estimated financial losses, harm to reputation , and regulatory fines are likely to materially exceed the amount claimed.
>
> Lower you see our contact email addresses:
> support@pubstorm.com
> support@pubstorm.net
>
> As evidence, we can show any 3 files you ask or data row.
> We are also ready to continue discussing the next steps after you confirm that you are a legitimate representative of the company.
> We are not interested in destroying your business. We want to take the money and you not hear from us again.
> Time is ticking on clock and in few days if no payment we publish and close chat.
> Please convey this information to your executive and managers as soon as possible.
> After a successful transaction and receipt of payment we promise
>
> 1) technical advice
> 2) We will never publish you data
> 3) Everything we download will be delete w/proof
> 4) Nothing will ever disclose
>
> Decide soon and recall that no response result in blog posting. Name is first and soon data after. We advice not reach point of no return.
>
> KR CL0P

27. Defendant UOPX was among numerous organizations affected by a large-scale cyberattack targeting entities using Oracle EBS. Public reports indicate that the attack was carried out by a financially motivated threat actor known as FIN11, with the Cl0p ransomware group serving as the public-facing operator of the scheme. In or around late September 2025, Cl0p began publicly identifying alleged victims of the Oracle EBS intrusion on its leak site, ultimately listing nearly thirty organizations spanning multiple industries, including industrial, transportation,

[3] Lawrence Abrams, *Clop Extortion Emails Claim Theft of Oracle E-Business Suite Data*, BLEEPINGCOMPUTER (Oct. 1, 2025), https://www.bleepingcomputer.com/news/security/clop-extortion-emails-claim-theft-of-oracle-e-business-suite-data/.

automotive, and higher-education sectors, among them UOPX.[4]

28. Cybersecurity experts have reported that the threat actors exploited previously undisclosed vulnerabilities, including CVE-2025-61882 and CVE-2025-61884, which permitted remote and unauthenticated access to data stored within Oracle EBS environments. Public reporting further indicates that the Cl0p ransomware group has already begun publishing data allegedly exfiltrated from multiple affected organizations. Preliminary technical analysis of the leaked materials suggests that the compromised files originated from Oracle systems. In light of Cl0p's documented history of conducting large-scale data-extortion campaigns and the consistency of the attack methodology, industry experts have concluded that it is unlikely that entities were falsely identified as victims.[5]

29. According to the notice posted on UOPX's website, the investigation into the Data Breach, discovered on November 21, 2025, found that an unauthorized third party had exploited a software vulnerability and removed certain information stored in the university's Oracle EBS environment, including individuals' names, contact information, Social Security numbers, dates of birth and bank account and routing numbers.

30. Neither UOPX nor Oracle's website has yet specified detailed measures or actions taken to fully remediate the vulnerabilities that led to the Data Breach, nor has it explained specific measures adopted to prevent future incidents.

***2. The Data Breach was Preventable***

31. Had UOPX and Oracle maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, UOPX and Oracle could have safeguarded

---

[4] Eduard Kovacs, *Nearly 30 Alleged Victims of Oracle EBS Hack Named on Cl0p Ransomware Site,* SECURITYWEEK (Nov. 10, 2025), https://www.securityweek.com/nearly-30-alleged-victims-of-oracle-ebs-hack-named-on-cl0p-ransomware-site/.
[5] *Id.*

Plaintiff and Class Members' data. UOPX and Oracle's lack of security controls and the delayed implementation of improved security measures, which were only put in place after the Data Breach, are inexcusable.

32. UOPX and Oracle were at all times fully aware of their obligation to protect individuals' PII and the risks associated with failing to do so. UOPX and Oracle knew that the information they collect, maintain, and store is highly coveted and a frequent target of hackers.

33. This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:

34. By 2013, it was reported that nearly one in four data breach notification recipients had become victims of identity fraud.[6]




35. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to encryption that allows users and criminals to conceal

---

[6] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters.

identities and online activity.

36. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the actors buy and sell it for profit.[7]

37. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[8]

38. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[9]

39. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office on May 26, the firm said it detected unauthorized access to its systems on March 6, with some systems found to be infected with malicious code . . . According to MCNA, the hackers were successful in accessing customer personal information."[10]

[7] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[8] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[9] *Id.*
[10] *Id.*

40. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[11]

41. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[12]

42. Another example is the U.S. Department of Justice's seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[13]

---

[11] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[12] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

[13] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramifications-identity-theft-fraud-dark-web/.

43. Consumer PII remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[15] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[16]

44. Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they can be used for a variety of fraudulent purposes and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[17]

45. Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and

---

[14] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[15] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[16] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[17] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

46. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

47. Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than, for example, credit card information in a retailer payment card breach, because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

48. The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[19]

49. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media accounts, credit cards, and tax records. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

---

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[19] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

50. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

51. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

52. Data breaches facilitate identity theft as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell it to others who do the same.

53. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[20] The GAO Report further notes that this type of identity fraud is the most harmful because it may take a victim some time to become aware of the fraud and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[21]

54. The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this highly sensitive information.

***3. UOPX and Oracle Failed to Comply with the Federal Trade Commission***

---

[20] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[21] *Id.*

55. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, data security should be factored into all business decision-making.[22]

56. In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business,"* which established guidelines for fundamental data security principles for businesses.[23] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

57. Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[25]

58. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately

---

[22] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[23] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.p
[24] *Id.*
[25] FEDERAL TRADE COMMISSION, *supra* note 22.

and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### *4. The Impact of Data Breach on Victims*

59. UOPX and Oracle's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

60. The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

61. Furthermore, malicious actors often wait months or years before using the PII obtained in data breaches, as victims become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

62. Given the confirmed exfiltration of Plaintiff and Class Members's PII from UOPX and Oracle, many victims of the Data Breach have likely already experienced significant harm, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

63. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[26]

64. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical

[26] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/wpcontent/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[27]

65. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

66. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[28]

67. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach

---

[27] *Id.*

[28] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

68. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by UOPX and Oracle without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

69. Even in instances where an individual is reimbursed for a financial loss due to

identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of 7 hours resolving issues related to identity theft or fraud.[29]

70. Plaintiff and Class Members place significant value on data security. According to a survey conducted by cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider that offers better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[30]

71. Plaintiff and Class Members have a direct interest in UOPX and Oracle's promises and duties to protect PII, i.e., that UOPX and Oracle would ***not increase*** their risk of identity theft and fraud. Because UOPX and Oracle failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by UOPX and Oracle's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for UOPX and Oracle's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

72. Plaintiff and Class Members further seek to recover the value of the unauthorized

---

[29] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[30] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

access to their PII permitted through UOPX and Oracle's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law principles of damages, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

73. Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as UOPX and Oracle continue to hold their PII.

## CLASS ACTION ALLEGATIONS

74. Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed class (collectively, "the Class"), defined as follows:

> **Nationwide Class**
> All persons in the United States whose Private Information was accessed, acquired, or compromised as a result of the 2025 data breach affecting Defendant University of Phoenix.

75. Excluded from the proposed Class are any officer or director of UOPX and Oracle;

any officer or director of any affiliate, parent, or subsidiary of UOPX and Oracle; anyone employed by counsel in this action; and any judge to whom this case is assigned, her or her spouse, and members of the judge's staff.

76. **Numerosity:** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from UOPX and Oracle's own records.

77. **Commonality:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether Defendants' inadequate data security measures were a cause of the Data Breach;

c. Whether Defendants owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether Defendants negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Defendants failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

78. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved.

Individual questions, if any, pale in comparison, both in quantity and quality, to the numerous questions that dominate this action.

79. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendants' misconduct affected all Class Members in the same manner.

80. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

81. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation could lead to inconsistent or contradictory judgments, increasing delays and costs for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and Class Members)

82. Plaintiff realleges paragraphs 1 through 81 as if fully set forth herein.

83. Plaintiff and the Class Members entrusted UOPX and Oracle, as entities that collected, processed, stored, and maintained their Private Information in connection with educational, employment, and related institutional activities, with the protection of their Private Information.

84. By collecting, maintaining, and utilizing Class Members' Private Information within UOPX's systems and within Oracle's managed software environment, Defendants owed Plaintiff and the Class Members a duty to exercise reasonable care to secure and safeguard the systems under their respective control, and the Private Information stored therein, to prevent unauthorized access, disclosure, theft, and misuse. This duty included the obligation to implement reasonable processes to detect security breaches in a timely manner and to take appropriate steps upon discovery of such breaches.

85. Defendants owed a duty of care to Plaintiff and the Class Members to implement and maintain data-security practices consistent with industry standards and applicable legal requirements, and to ensure that all systems, networks, and personnel involved in handling Private Information adequately protected such information from unauthorized access and disclosure.

86. Defendants' duties of care arose from the special relationship between Defendants and Plaintiff and the Class Members, who provided their confidential Private Information to Defendants in connection with enrollment, employment, instruction, financial transactions, and related institutional operations. This special relationship is recognized by common law and laws

governing unfair and unreasonable commercial practices.

87. Defendants additionally owed a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices in commerce, including the failure to use reasonable measures to protect sensitive and confidential data.

88. Defendants further owed a duty to protect confidential Private Information in accordance with generally accepted industry standards applicable to entities that collect and maintain sensitive personal and financial data.

89. Defendants breached their duties and were negligent by failing to use reasonable measures to protect Class Members' Private Information. Such acts and omissions include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of the systems they controlled or utilized;

c. Failing to regularly assess and update security safeguards to address known risks;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to timely detect that Class Members' Private Information had been accessed or compromised;

f. Failing to take reasonable steps to mitigate foreseeable harms resulting from the Data Breach; and

g. Failing to secure system endpoints and workstations used to access Oracle's platform, even after the exploitation of security vulnerabilities.

90. It was reasonably foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and the Class Members. The risk of data intrusion and misuse of Private Information was well-known in the industry at the time of the breach.

91. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer damages, including but not limited to loss of privacy, increased risk of identity theft and fraud, out-of-pocket losses, time and expenses incurred to mitigate the effects of the Data Breach, and other consequential damages.

92. Defendants' negligent conduct is ongoing in that Defendants continue to retain Plaintiff's and Class Members' Private Information without having implemented sufficient and reasonable safeguards to adequately protect it from future compromise.

93. Plaintiff and the Class Members are entitled to compensatory and consequential damages in an amount to be proven at trial.

94. Plaintiff and the Class Members are further entitled to injunctive and equitable relief requiring Defendants to, at a minimum: (i) implement and maintain reasonable data-security systems and monitoring procedures; (ii) submit to regular, independent security audits; and (iii) take appropriate remedial measures to safeguard Class Members' Private Information from future breaches.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

95. Plaintiff realleges paragraphs 1 through 81 as if fully set forth here.

96. When Plaintiff and Class Members provided their Private Information to UOPX in connection with enrollment, employment, instruction, financial transactions, and related institutional activities, and when UOPX, in turn, transmitted that information to Oracle for storage and management within Oracle's software environment, Plaintiff and Class Members entered into implied contracts with Defendants under which Defendants agreed to reasonably safeguard that information.

97. Defendants solicited, offered, and invited Plaintiff and Class Members to provide their Private Information as part of UOPX's regular operations and Oracle's provision of the software platform used to manage such information. Plaintiff and Class Members accepted Defendants' offers and, in reliance on them, provided their Private Information to Defendants.

98. In entering into these implied contracts, Plaintiff and Class Members reasonably understood and expected that Defendants' data-security practices would comply with applicable laws and regulations and with generally accepted industry standards for the protection of sensitive information.

99. Plaintiff and Class Members provided something of value to Defendants, including but not limited to tuition payments, fees, labor, services, and participation in institutional programs, with the reasonable expectation that Defendants would use a portion of those resources to implement and maintain adequate data-security measures. Defendants failed to do so.

100. Plaintiff and Class Members would not have entrusted their Private Information to Defendants absent Defendants' implied promise to take reasonable measures to protect that information from unauthorized access and misuse.

101. Plaintiff and Class Members would not have entrusted their Private Information to Defendants absent Defendants' implied promise to monitor their computer systems and networks and to maintain reasonable data-security safeguards.

102. Plaintiff and Class Members fully performed, or substantially performed, all obligations required of them under the implied contracts with Defendants.

103. Defendants breached their implied contracts with Plaintiff and Class Members by failing to implement reasonable measures to safeguard and protect their Private Information.

104. As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiff and Class Members suffered damages as alleged herein, including the loss of the benefit of their bargain.

105. Plaintiff and Class Members are entitled to recover compensatory, consequential, and nominal damages resulting from Defendants' conduct.

106. Plaintiff and Class Members are also entitled to injunctive and equitable relief requiring Defendants to engage in certain activities, including but not limited to, the following: (i) strengthen their data-security systems and monitoring procedures; (ii) submit to regular, independent security audits of those systems and procedures; and (iii) take immediate and appropriate remedial actions to safeguard Class Members' Private Information from future compromise.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and Class Members)**

107. Plaintiff realleges paragraphs 1 through 81 as if fully set forth herein.

108. Defendants received monetary and other valuable benefits from Plaintiff and Class Members, including but not limited to tuition, fees, wages, labor, services, and other forms of consideration, in connection with UOPX's educational, employment, and institutional operations and Oracle's provision of data-management services.

109. Defendants also received the benefit of collecting, using, monetizing, and retaining Plaintiff's and Class Members' Private Information in connection with those operations.

110. Plaintiff and Class Members conferred these benefits on Defendants with the reasonable expectation that Defendants would use a portion of the value received to implement and maintain reasonable data-security practices to protect their Private Information.

111. Defendants knowingly accepted and retained these benefits under circumstances

that made it inequitable for them to do so without paying fair compensation for the protection and security of Plaintiff's and Class Members' Private Information.

112. Defendants failed to implement reasonable data-security measures despite retaining the benefits conferred by Plaintiff and Class Members, thereby unfairly retaining monies and other value that should have been used to safeguard Private Information.

113. As a direct and proximate result of Defendants' wrongful conduct, Defendants were unjustly enriched at the expense of Plaintiff and Class Members.

114. Under principles of equity and good conscience, Defendants should not be permitted to retain the benefits conferred upon them without providing restitution to Plaintiff and Class Members.

115. Plaintiff and Class Members are entitled to restitution, disgorgement, and all other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against UOPX and Oracle, as follows:

a. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

b. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

c. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent UOPX and Oracle from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

d. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

e. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

f. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: December 5, 2025

Respectfully submitted,

*/s/Roger L. Mandel*
Roger L. Mandel
TBN: 12891750
**MANDEL LAW GROUP**
3416 Pelham Rd
Fort Worth, TX 76116
(214) 762-1036
rogerlmandel@gmail.com

Scott J. Falgoust (La. Bar No. 33545)*
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
P: (919) 585-5634
sfalgoust@brysonpllc.com

**Pro Hac Vice Motion Forthcoming*

*Counsel for Plaintiff*